[No. B043674. Second Dist., Div. Seven. July 15, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY DELL, Defendant and Appellant.

**COUNSEL**

Dennis A. Fischer for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Linda C. Johnson and Sanjay T. Kumar, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Appellant, Mary Dell, aka Winifred Strand, appeals from a judgment of conviction after a jury trial for one count of pimping and two counts of pandering in violation of Penal Code sections 266h and 266i. We

find the various assignments of error do not warrant reversal and affirm the judgment below.

## Facts and Proceedings Below

Because there is no challenge to the sufficiency of the evidence to sustain the convictions, the facts may be briefly summarized.

Undercover police conducted a 10-month investigation of the Rendezvous Escort Agency which was suspected of being a front for prostitution. Appellant promoted the Rendezvous Escort Agency by placing advertisements in the yellow pages of telephone directories.

During the investigation undercover officers called the advertised number and requested an escort be sent to their hotel room. The dispatcher took the name and location of the caller and inquired if the hourly fee of $200-$300 would be paid by cash or credit card. If the caller indicated credit card, the dispatcher would verify the caller's credit with the credit card company and receive authorization for the charge. The dispatcher then contacted one of the escorts to make the "outcall." The escort would then call the customer to ensure the location was in fact as indicated and to hopefully screen out policemen or other undesirable men. Upon arrival at the designated location, the escort would request the fee up front; and if payment was by credit card, would prepare the voucher and get the customer's signature and verify identification. The escort would then telephone the dispatcher to say that everything was all right.

With the formalities completed, the escorts would then completely undress and offer condoms for the officers' use. The escorts either volunteered the sex acts they would perform, or the officers inquired as to what they could expect for the fee. The typical response was sexual intercourse and oral copulation.

When the escorts left they again called the dispatcher to arrange a location to drop off the agency's portion of the escorts' proceeds.

Appellant was linked to the operation by evidence she personally hired and trained some of the dispatchers. Telephone company personnel testified she personally placed and authorized the telephone page advertising for the Rendezvous Escort Agency. Evidence was also introduced she had call forwarding facilities and a telephone system in place to link her personal residences with the dispatch locations. There was also testimonial evidence appellant personally visited the dispatch location weekly to pick up the receipts.

As part of the undercover operation, a police officer posing as a representative of the Diner's Club credit card company had a meeting with appellant to explain several customers had disputed charges attributed to her company. At this meeting appellant announced she would change the merchant account name for credit card purchases to L.A. Services Company to help to jog her customers' memory as to the purpose of the charge. Appellant executed documents making this change as "owner" of the L.A. Services Company. Subsequent credit card charges made by the police officers during the investigation of the escort agency bore the name L.A. Services Company on the voucher.

Searches of appellant's home and the dispatch location revealed lists of regular customers with their sexual preferences and lists of "jerks" and suspected police officers. At the dispatch location police recovered a schedule of the agency's fees and a commission schedule for the dispatchers based on the escorts' fees.

After a trial by jury, appellant was convicted as charged on all three counts. She appeals from the judgment of conviction.

DISCUSSION

I. REPLACEMENT OF THE TWO REGULAR JURORS WITH ALTERNATES WAS PROPER.

 Appellant contends it was reversible error for the court to dismiss two regular jurors without a hearing to demonstrate good cause for the dismissal.

Penal Code section 1089 describes the situations in which a regular juror may be properly substituted for an alternate. "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, . . ." (Pen. Code, § 1089.) Thus, the grounds for use of the alternates are: 1) death of a juror; 2) illness of a juror; 3) good cause shown to the court; and, 4) request of a juror for good cause.

In this case illness was the ground for the dismissal of both jurors. After jury deliberations had begun, the court announced its clerk received a phone call from juror number 3. At the court's request the clerk stated for the record the juror "indicated that he had an attack of phlebitis and he wished to be excused because he was feeling very ill." The court announced "Okay. I

am excuseing [*sic*] him. And we called [the prosecutor], who had no objection, and [defense counsel] I understand from [the clerk] said he understood, but he did have an objection because he liked that juror. So I had excused the juror for cause because he was ill. He had a problem during trial."

Approximately one-half hour later, the court again went on record: "We've been waiting—it's now 20 of 10:00. We've been waiting for juror No. 10 to arrive. I was informed by [the clerk] that she received a call from [the juror's] cousin. [The juror] was in an accident and is being taken to the hospital. She indicated that she was sore and she would try to come in tomorrow but she couldn't promise, but she's being taken to the hospital and is in bad shape today. I'm going to have to excuse her for legal cause at this time. I'm assuming—well, I don't know how [defense counsel] feels."

The court's clerk tried unsuccessfully to reach defense counsel, but he was "not in the office." The court announced "Okay. However, [appellant] is present. I'm assuming that maybe [defense counsel] might object again, but he can put his objection on the record. ██ I'm still going to use the two alternates."[1]

██ In support of her argument that a hearing was required before the regular jurors could be dismissed, appellant relies on several cases construing the third and fourth grounds—good cause shown to the court and at the request of a juror for good cause. These decisions, however, do not directly control the situation of juror illness. The cases appellant cites seem to follow a general pattern: when the reason for disqualification of a juror is not immediately apparent to the court, the proper procedure appears to include a summary hearing to determine the factual basis for the disqualification or the sincerity of the juror's claim he or she is incapable of performing the duties of a juror. (See, e.g., *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251] [error for court to retain juror without a hearing after being put on notice juror using drugs and alcohol and possibly incapable of deliberating]; *People* v. *Hamilton* (1963) 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412] [on a charge of bias the court has a limited discretion to determine the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality]; *People* v.

---

[1]The People contend this point is not preserved on appeal due to counsel's failure to properly object below. (*People* v. *Davidian* (1937) 20 Cal.App.2d 720, 727 [67 P.2d 1085] [objection after substitution "came too late and can avail appellant nothing upon this appeal"].)

In this case, the court was aware of, or presumed, defense counsel's objection before ruling. "An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide." (*People* v. *Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123].) Even if the objection was phrased improperly, we deem it sufficient to reach the merits of the issue as did the *Davidian* court.

*McNeal* (1979) 90 Cal.App.3d 830 [153 Cal.Rptr. 706] [failure to hold hearing to determine bias requires reversal]; *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742] [legal necessity to discharge because juror stated at hearing could not follow court's instructions and could not decide the case on the law and the evidence presented]; *People* v. *Thomas* (1990) 218 Cal.App.3d 1477 [267 Cal.Rptr. 865] [hearing in camera after foreperson accused one juror of bias against police officers]; *People* v. *Compton* (1971) 6 Cal.3d 55 [98 Cal.Rptr. 217, 490 P.2d 537] [reversed because double jeopardy had attached after the court dismissed the entire jury instead of holding a hearing to determine actual bias of an alternate juror].)

On the other hand, the determination of good cause for dismissal after a juror's request to be dismissed does not always require a hearing. A juror's disqualification is discretionary with the court and if there is any substantial evidence supporting the decision it will be upheld on appeal. (*People* v. *Farris* (1977) 66 Cal.App.3d 376, 386 [136 Cal.Rptr. 45].)

In *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318], the court explained: "Unless the facts clearly establish a sufficient basis on which to reach an informed and intelligent decision, the court must conduct an appropriate hearing in the presence of litigants and counsel on the question of the juror's ability to serve." Yet the court went on to hold it was not an abuse of discretion to dismiss a juror whose brother had died during the night without a hearing and in the absence of counsel because the circumstances "clearly constituted good cause." (*Ibid.*; see also *People* v. *Hess* (1951) 104 Cal.App.2d 642, 680 [234 P.2d 65] [no abuse of discretion in dismissing a juror to allow her to be with her father who had suffered a stroke despite defendant's objection of an insufficient factual showing the juror's father was actually ill]; *People* v. *Hall* (1979) 95 Cal.App.3d 299, 305 [157 Cal.Rptr. 107] [no abuse of discretion in dismissing a juror who was required to drive his wife to the hospital for surgery and wished to remain with her].)

When jurors have become ill during deliberations a summary proceeding was generally held because the juror was present in the courtroom. In some cases, testimony was received from the doctor or bailiff only and the juror was not allowed to testify concerning his or her condition. (See, e.g., *People* v. *Tinnin* (1934) 136 Cal.App. 301 [28 P.2d 951] ["the juror's appearance before the court without the aid of such testimony, may itself be sufficient proof thereof "]; *People* v. *Von Badenthal* (1935) 8 Cal.App.2d 404 [48 P.2d 82] [juror dismissal based on doctor's testimony too ill to continue proper, although juror not allowed to testify and later claimed could have continued].)

We note there is no statutory procedure for determining the existence of a ground of discharge. In the absence of a stipulation by counsel, "the judge must act on his own motion,[2] expeditiously. His summary determination, on the basis of any evidence . . . will seldom be successfully challenged." (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2875, p. 3507.)

When the juror is not present in the courtroom it would appear unreasonable to require the sick or hospitalized juror to come into the courtroom in order to hold a hearing to substantiate the factual basis for the juror's claim of illness. As in *In re Mendes, supra*, 23 Cal.3d at page 852, "a hearing would have been pointless and perhaps callous." In this case, it appears from the record all parties knew juror number 3 was sick during the trial. The court's observation of the juror's appearance is a sufficient basis to determine the juror is too ill to continue. (*People v. Tinnin, supra*, 136 Cal.App. 301, 318.) The court did not observe juror number 10 after her accident. However, the phone call from her cousin saying the juror was in bad shape and was being taken to the hospital for treatment is evidence the juror was too ill to continue functioning as a juror. In the absence of any contrary showing, we can presume there was a factual basis the juror was in fact injured in a car accident and incapable of continuing. (*People v. Hess, supra*, 104 Cal.App.2d at p. 681.)

It was within the court's discretion to determine good cause for dismissal. We cannot say on this record the court's decision exceeded the bounds of reason or was manifestly unjust. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) In sum, we find no abuse of discretion.

■ In fact, appellant does not claim she was actually prejudiced from the substitution of jurors nor does it appear she could reasonably make such an argument. Alternates are selected from the same source, in the same manner, with the same qualifications and are subject to the same challenges. Alternates have an equal opportunity to observe the entire proceedings and take the same oath as the regular jurors. (*People v. Collins, supra*, 17 Cal.3d 687, 694.) In this case, appellant had ample opportunity to voir dire the alternates and use her allotted peremptory challenges. (Cf. *People v. Armendariz* (1984) 37 Cal.3d 573 [209 Cal.Rptr. 664, 693 P.2d 243] [reversible

---

[2]We recognize it would have been a more appropriate procedure for the trial court to have commuicated directly with the ill jurors or their physicians prior to its determination the jurors were too ill to continue deliberations. Ideally, the trial court would also have consulted with counsel as well before formally dismissing the ill jurors.

However, despite the absence of these desirable procedures, for reasons explained in this opinion we cannot conclude the failure to utilize better alternatives constituted an abuse of the trial court's discretion or denied appellant her constitutional right to jury trial.

error to deny counsel's request to reopen jury selection to permit the use of unused peremptory challenges].) Nor is there any allegation the alternates were either incompetent or biased.

Appellant instead claims she need make no showing of actual prejudice because it was reversible error per se to remove the jurors without counsel being present. Appellant cites this court to *People v. Locklar* (1978) 84 Cal.App.3d 224 [148 Cal.Rptr. 322] in which it was held reversible error per se to commence voir dire of the jury despite the public defender's statement he would ask no questions nor exercise any challenges but would continue to insist upon a continuance until regular counsel could be present. The court found counsel's position operated to deprive the defendant of assistance of counsel at a critical stage of the proceedings. From this decision appellant asks this court to extrapolate the corollary, absence of counsel at the substitution of jurors is also denial of assistance of counsel at a critical phase of the trial. However, the rule implicit in the Supreme Court's decision in *In re Mendes, supra,* 23 Cal.3d 847, is there is no constitutional violation when alternate jurors are substituted in the absence of counsel. Under the circumstances of that case, the immediate replacement of a regular juror with an alternate without a hearing and in the absence of counsel was not even an abuse of discretion.

Moreover, we fail to see how counsel's presence at the substitution of the alternates could have influenced the proceedings. Counsel knew no more about the jurors' illness than the court or clerk knew and therefore could offer nothing to a determination of good cause. Nor could counsel influence the health of the jurors. This was not a situation calling for the advice and judgment of counsel similar to selecting the individuals to judge the fate of one's client. Substituting a juror did not require counsel's presence to observe the demeanor and mannerisms of those who potentially controlled the outcome of the case. Indeed, counsel had already accepted and approved the very persons being substituted in. Counsel's discretion and judgment were exercised during the selection and voir dire of the prospective jurors and we do not see how counsel's presence at the substitution could have made a difference.

We do not find the substitution of jurors necessarily to be a critical stage in the proceedings such that it gives the defendant the constitutional right to assistance of counsel. Nor was appellant denied the right to a jury trial by the substitution of two alternates she had previously screened and approved. Immediate removal of the jurors due to illness under these circumstances is not a departure from established procedure rising to the level of interference with the right to a trial by jury. (Cf. *People v. Armendariz, supra,* 37 Cal.3d 573.)

## II. The Testimony of the Police Officers Was Properly Admitted.

■ Appellant contends the testimony of the police officers relating the escorts' statements concerning the sex acts they would perform for the fee was inadmissible hearsay. The trial court ruled the officers' testimony was admissible under the coconspirator exception. (Evid. Code, § 1223.) Defense counsel objected on the basis the prosecutor should not be allowed to introduce the escorts' hearsay statements until the People had made out a prima facie case of a conspiracy. The objection was overruled.

On appeal, appellant argues application of the coconspirator exception to a prostitute/declarant is erroneous as a matter of law because a prostitute cannot be charged with conspiring with her pimp (*Williams* v. *Superior Court* (1973) 30 Cal.App.3d 8 [106 Cal.Rptr. 89]), nor can she be charged with aiding and abetting her panderer (*People* v. *Berger* (1960) 185 Cal.App.2d 16 [7 Cal.Rptr. 827]; *People* v. *Wilkins* (1955) 135 Cal.App.2d 371, 378 [287 P.2d 555]). As a result, a prostitute cannot be a "declarant while participating in a conspiracy" with her pimp and panderer and admission of the escorts' statements under this hearsay exception was error.[3] Although one case holds to the contrary (*People* v. *Ambrose* (1986) 183 Cal.App.3d 136 [227 Cal.Rptr. 885]), we need not reply directly to this contention for we are of the opinion the statements were admissible as "verbal acts" or "operative facts" of the crime of prostitution and were not hearsay. (Evid. Code, § 1200; Johnson, Cal. Trial Guide (1986) Hearsay, § 40.11, p. 40-21; 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 588-592, pp. 561-566; 6 Wigmore, Evidence (Chadbourn ed. 1976) § 1770, p. 259; 2 Wharton's Criminal Evidence (14th ed. 1986) § 266, p. 162; 4 Weinstein & Berger, Weinstein's Evidence, § 801(c)[01], p. 801-86.) ■ It is immaterial if the ground relied on below was erroneous if the action taken, i.e., admission of the evidence, was otherwise proper. (*People* v. *Romero* (1977) 68 Cal.App.3d 543, 548 [137 Cal.Rptr. 675]; *People* v. *Patton* (1976) 63 Cal.App.3d 211, 219 [133 Cal.Rptr. 533].)

■ California courts have had limited opportunity to apply the "verbal acts" principle in the context of solicitation and prostitution cases. For example, in *People* v. *Jones* (1962) 205 Cal.App.2d 460 [23 Cal.Rptr. 418] the defendant was prosecuted for rescuing a prisoner from the lawful custody of a police officer. The police officer testified he arrested the prisoner after

---

[3]Evidence Code section 1223 provides in pertinent part:
"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:
"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; . . ."

hearing him solicit homosexual acts from men in the park. The out-of-court statements were held admissible because the statements to the men in the park constituted the offense that justified the police officer's arrest of the prisoner. The unlawful sexual solicitations were offered to prove lawful custody as an element of the prosecution's case. The court held the sexual solicitation was not offered for the truth of the matter asserted but constituted verbal acts of the underlying offense of solicitation for which he was validly arrested.

In *People* v. *Patton*, *supra*, 63 Cal.App.3d 211, the defendant was charged with pandering. A tape recording of his telephone conversation attempting to convince a young runaway to become a prostitute was held admissible over defendant's hearsay objection. The court found the tape recording to be not hearsay at all but direct evidence of the contents of the conversation. The crime of pandering is committed if a defendant uses words of encouragement to a person to become a prostitute. It was irrelevant to the case whether the defendant actually intended to carry out his promises of finding an apartment for her, taking care of her needs and arranging bail if she were to be arrested. "The conversation itself was not hearsay because it was not offered for the truth of the matters asserted. Defendant's statements to Gail constituted the substantive offense with which he was charged, and therefore were 'operative facts.' " (*Id.* at p. 219.)

However, decisions from other jurisdictions that have passed upon the question are unanimous in their finding that statements of solicitation by a prostitute, testified to by others, are not obnoxious to the hearsay rule and are admissible as "verbal acts," i.e., as direct evidence of the substantive offense.

For example, in *State* v. *Iwasaki* (1978) 59 Hawaii 401 [581 P.2d 1171], undercover police officers posing as tourists went to a private club suspected of running a prostitution business. Once admitted, the officers were told the "session" would be $70 each. When the officer inquired if the session would be similar to massage parlors in Japan, the defendant replied " 'No, here all they do is strictly for sex, sexual pleasure.' " (581 P.2d at p. 1172.)

The officers also testified one of the women said " 'We'll get started. . . . We're going to [have sexual intercourse]. Isn't that what you paid your money for?' " The second officer testified the woman assigned to him stated " 'You take off clothes . . . . You [have sex].' " (581 P.2d at p. 1172.)

The defendant, who was charged with promoting prostitution, objected to the officers' testimony as inadmissible hearsay. The Hawaii Supreme Court disagreed stating: "The defendant was accused of promoting prostitution

'involving prostitution activity by two or more prostitutes.' Whether [the two women] were engaged in prostitution activity at the time in question was necessarily relevant to the offense for which the defendant was indicted. The statements attributed to the two women were made by participants during the course of events, and thus were part of the transaction constituting the alleged violation. These were verbal acts serving to illuminate or to explain the nature of the activity in which the women and the defendant were engaged, and as facts constituting a part of the transaction, they were admissible in evidence under the rule of res gestae." (581 P.2d at p. 1172.)[4]

In *State* v. *Saitz* (Mo. 1968) 425 S.W.2d 96, the defendant lost his liquor license for allowing prostitution activities in his tavern. State agents testified that after being served drinks in defendant's bar, one of the several women loitering in the bar solicited them for purposes of sex at the rate of $5 per agent. The defendant contended the agents' testimony regarding the prostitutes' out-of-court statements was not competent evidence against him. The Missouri Supreme Court disagreed. "Nor is the agents' testimony that the two women approached them for drinks and prostitution hearsay. Such testimony was not for the purpose of proving the truth of the statements, i.e., whether the women would do the proposed acts for the stated sum, but was to show that proscribed activities did occur in appellant's tavern. As such, the women's statements simply were observable 'verbal acts, which actually are a part of the transaction under investigation' and to which the agents, as witnesses, were competent to testify." (*Id.* at pp. 99-100, internal citations deleted.)

In *State* v. *Malena* (1967) 4 Conn. 594 [237 A.2d 572], the defendant, the operator of Al's Music Bar, was prosecuted for maintaining a "house of ill-fame" which resulted in the revocation of his liquor license. Vice officers testified they were approached by women and invited to engage in various types of sexual relations for money. The defendant claimed the testimony of the officers as to what the women said to them was inadmissible hearsay. The court found otherwise: "the testimony was offered, not for the truth of the matter, but only to show the use to which the premises were put. . . . Such testimony was admissible as evidence of verbal acts, not to establish

---

[4]The term, "res gestae" has been used to describe such evidence as state of mind, excited utterances, present sense impressions, and other evidence, including verbal acts.

More recent cases and commentators criticize the term as too vague and ambiguous to justify its continued use where well-recognized existing principles better define the specific categories of evidence encompassed within the term. (See, e.g., 6 Wigmore, Evidence (Chadbourn ed. 1976) § 1767, p. 253; McCormick, Evidence (3d ed. 1984) Hearsay, § 249, p. 732.) Distinguishing between types of res gestae evidence makes understanding and application of the rules of admissibility of evidence more manageable for courts and litigators alike. Thus, for purposes of clarity, we adopt the terminology of "verbal act" or "operative fact" to describe the type of evidence at issue in this case.

the truth of the facts related but to establish what would amount to the activities described in the information. 'The evidence is admitted, not as an exception to the hearsay rule, but because it is not within the rule.' " (*Id.* at p. 577.)

In *State* v. *Forsythe* (1962) 243 La. 460 [144 So.2d 536], the defendants were prosecuted for renting their premises for prostitution. Over the defendants' hearsay objection, police officers testified that while they were in the bar portion of the building they were accosted by females who offered to have sex with them for money. For an additional $3 they could use the lodging quarters located above the bar. The Louisiana Supreme Court explained: "To constitute res gestae, the circumstances and declarations must be necessary incidents of the criminal act . . . . What the women said to the police officers in the instant case was a necessary incident of the criminal act of letting the premises to be used for the practice of prostitution, and constituted part of one continuous transaction. It was clearly admissible as res gestae under the Code and jurisprudence." (144 So.2d at pp. 537-538.)

*Pauline* v. *Lee* (Fla. Dist. Ct. App. 1962) 147 So.2d 359 was another case in which the defendant lost his liquor license because he allowed solicitation for prostitution at his business location. Police officers testified that on separate occasions several female employees of the defendant approached them in the bar, induced them to buy drinks and offered to engage in sexual intercourse with them for consideration. This testimony was challenged as improperly admitted hearsay. The court found the statements not hearsay at all explaining, "Such testimony was not introduced to establish the truth of the statements attributed to the girls (declarants) but was introduced solely to establish the fact of utterance, which, in this case constituted the solicitation for prostitution in violation of the law. In effect, the state's witnesses testified to statements amounting to verbal acts. It is well settled that such statements are admissible in evidence and in nowise run afoul of the hearsay rule. . . ." (*Id.* at p. 363.)

Words of solicitation for prostitution are essentially words of offer and acceptance in the formation of a contract for sex in exchange for money. When trying to prove the existence of an oral contract the words the offeror uttered in making the offer clearly are admissible as nonhearsay to prove an essential element of the contract. (1 Witkin, Cal. Evidence (3d ed. 1986) § 589, p. 562 and cases cited therein ["Proof of the oral or written words of offer and acceptance, or other statements constituting a contract or novation, may be made in an action based upon it."]; 6 Wigmore, Evidence (Chadbourn ed. 1976) § 1770, p. 259 ["Where the utterance of specific words is itself a part of the details of the issue under the substantive law and the pleadings, their utterances may be proved without violation of the hearsay

rule, . . . (a) The making of a contract necessarily involves utterances . . . ," italics deleted]; McCormick, Evidence (3d ed. 1984) Hearsay, § 249, p. 733 ["proof of oral utterances by the parties in a contract suit constituting the offer and acceptance which brought the contract into being, are not evidence of assertions offered testimonially but rather of utterances—verbal conduct—to which the law attaches duties and liabilities."]; see also, 4 Weinstein & Berger, Weinstein's Evidence, § 801(c)[01], p. 801-87.)

At least one decision expressly recognizes that words of solicitation for prostitution are words of contract. *Morgan* v. *State* (Tex.Civ.App. 1980) 596 S.W.2d 220, involved an action to declare a nightclub a public nuisance. Police officers and a citizen testified they were repeatedly solicited to engage in sexual activities within the premises in exchange for fixed fees. The court held testimony of statements made by the prostitutes was not hearsay but was properly admitted as "operative facts" used to prove a critical issue in the case—that prostitution was in fact taking place on the premises making the nightclub a public nuisance. "Clearly, the utterances heard by and testified to by the officers and their assistant were admitted as 'operative facts'. The statements, themselves, possess legal significance in demonstrating that the promotion of prostitution was indeed taking place on the premises in question. They were not tendered to prove the fact that such acts would be performed. The admission of this testimony is akin to the admission of testimony as to a contractural offer, and such has been held not to constitute hearsay evidence." (*Id.* at pp. 221-222.)

Similarly in this case, the statements of the escorts, testified to by the officers, also were not offered for the truth of the matter asserted. The statements were not offered to prove the escorts would actually perform these specific sex acts and at the quoted price. For example, there is no special significance in one escort's statement it would cost an additional $40 for oral copulation without a condom. The truth or falsity of what the escort said is immaterial. In these types of situations, the content of the words spoken is irrelevant, the significance is in the fact the words were uttered at all. These statements could be admitted as "operative facts" or "verbal acts" because they demonstrated an issue in the case: that the escorts were making verbal offers to enter into contracts of prostitution, that is, to engage in sexual intercourse or other lewd acts for money. The purpose of this evidence, in turn, was to prove appellant's business involved prostitution as an element of the pimping and pandering charges.

We conclude the police officers' testimony was not hearsay and was properly admitted as evidence of verbal acts.

III. The Instructions on and Further Clarification of the Definition of Prostitution Did Not Mislead the Jury.

■ Appellant argues the court committed reversible error by failing to give the instruction defining prostitution (CALJIC No. 16.420) and then by giving confusing responses to the jury's questions concerning the elements of prostitution.

The refused instruction defining prostitution provides:

"Every person [who with the specific intent to engage in prostitution, solicits another to engage in] [or] [who agrees to engage in] [or] [who engages in] prostitution is guilty of a misdemeanor.

"Prostitution is engaging in [sexual intercourse] [or] [any lewd act between persons] for money or other consideration.

"['lewd act', as used in this instruction, means any act which involves the touching of the genitals, buttocks or female breast of one person by any part of the body of another person and is done with the intent to sexually arouse or gratify.]

"[A person agrees to engage in an act of prostitution when, with specific intent to so engage, [he] [she] manifests an acceptance of an offer or solicitation to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in prostitution. An agreement to engage in an act of prostitution by itself does not constitute a violation of law unless some act, in addition to the agreement, be done in furtherance of the commission of an act of prostitution by the person agreeing to engage in that act.]" (CALJIC No. 16.420.)

Appellant concedes proper instructions were given on pimping and pandering which also defined prostitution as sexual intercourse or any lewd act for money or other consideration. (CALJIC Nos. 10.70 and 10.71.)

During deliberations the jury asked the court to define "lewd act" and asked whether sexual intercourse was required for an act of prostitution. In answering the first question, the court gave the definition of lewd act as described in the refused CALJIC No. 16.420 instruction which in turn is based on *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 256 [158 Cal.Rptr. 330, 599 P.2d 636]. In answering the second question the court stated, "As long as the person has the specific intent to engage in sexual intercourse for money or other consideration, it is not necessary for the person to so engage in actual intercourse."

In reliance on *People* v. *Hill* (1980) 103 Cal.App.3d 525 [163 Cal.Rptr. 99], appellant claims the combination of instructions allowed the jury to find an act of prostitution without the requisite act of bodily contact. *Hill*, however, is inapposite because the jurors there were not instructed on the definition of "lewd act." In that case the defendant was prosecuted for pimping and pandering. An undercover policeman called a number listed in a newspaper advertisement which started off with the phrase "warm, wet and wild" and advertised Don for nude photographs. The individual answering the phone identified himself as Don and asked the officer if he was interested in obtaining a young 15-year-old boy for $300. The officer said that would be fine and eventually a young man came to his hotel room accompanied by Don. When asked what he could expect for his money, the officer was told an act of oral copulation and an act of sodomy.

At trial the officer testified he and the defendant discussed obtaining the man for sexual purposes. The defendant and the man denied this and testified the man was only there as a model for nude photographs. Based on this contradictory evidence regarding the defendant's intent, the court held it was error not to instruct the jury on the definition of "lewd act." If the jury believed the defendant's story that the sole purpose for procuring the man was for nude photographs, the defendant would not have the requisite intent for the bodily contact necessary for a finding of "lewd act" and therefore for prostitution. Without a clear finding of prostitution, an essential element of both pimping and pandering, defendant's conviction was reversed.

In this case no contradictory evidence was offered to rebut these escorts' intent to accept money for sexual acts. Nor was the jury in this case improperly instructed. CALJIC Nos. 10.70 and 10.71 instructed prostitution was sexual intercourse or any lewd act in exchange for money or other consideration and that they had to find an act of prostitution as a necessary element of both pimping and pandering. Whatever defect that existed in the original giving of the instructions was cured by the court's subsequent answers to the jurors' questions. The jury was informed of the various acts involving bodily contact that are collectively called "lewd acts." The jury was also correctly informed an actual act of intercourse is not required to be guilty of an act of prostitution. As the refused instruction points out, and as *People* v. *Hill, supra*, 103 Cal.App.3d 525 explains, prostitution occurs when the person has the specific intent to engage in either sexual intercourse or lewd acts in exchange for money or other consideration for the purpose of sexual arousal or gratification and takes some step in furtherance of that act. The combination of instructions and clarifying answers provided the jury with sufficient guidance to reach their verdict. ■ " '[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather

than in one instruction does not, in itself, make the charge prejudicial. The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.'" (*People* v. *Burgener, supra,* 41 Cal.3d at pp. 538-539, internal citations deleted.)

We find no error in the instruction on prostitution.

IV. REFUSAL OF A UNANIMITY INSTRUCTION WAS NOT ERROR.

■ Finally, appellant contends the court committed reversible error in failing to give a unanimity instruction directing the jury to agree on which acts constituted the offense in each count.[5]

Generally the prosecution should be required at the commencement of the trial to elect the incident on which it is relying to support a conviction if proof at trial demonstrates several potential incidents. If the prosecution fails to make such an election, a unanimity instruction is generally required. (*People* v. *Castro* (1901) 133 Cal. 11, 13 [65 P. 13]; *People* v. *Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971].) As the court in *People* v. *Ramirez* (1987) 189 Cal.App.3d 603, 612-613 [233 Cal.Rptr. 645], explained: "[A]n instruction like 17.01 is required when disagreement among jurors as to the act underlying a conviction is possible. These cases refuse to assume that the jury will infer the specific unanimity requirement from other instructions. Rather, while recognizing that the jurors *might* have unanimously agreed on the act in question, these cases note 'such agreement would necessarily be fortuitous absent a proper instruction.'" (*Id.* at pp. 613-614, italics in original, internal citations deleted.) The court went on to hold where there was no realistic possibility of disagreement among the jurors or where the jury could only accept or reject a defense in toto, a unanimity instruction is unnecessary.

An additional exception to the unanimity instruction requirement has also been recognized for continuous criminal conduct resulting in a single offense. (*People* v. *Diedrich, supra,* 31 Cal.3d at p. 281.) Examples of continuing criminal conduct include child abuse (*People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299]); concealing stolen property (*People* v. *Feldman* (1959) 171 Cal.App.2d 15, 25 [339 P.2d 888]); and contributing to the delinquency of a minor (*People* v. *Schoonderwood* (1945) 72 Cal.App.2d 125, 127 [164 P.2d 69]). Most significantly, both pimping and

---

[5]CALJIC No. 17.01 provides: "The defendant is charged with the offense of _____. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

pandering have been held to be crimes of a continuous ongoing nature and are therefore not subject to the requirement the jury must agree on the specific act or acts constituting the offense. (*People* v. *Lewis* (1978) 77 Cal.App.3d 455 [143 Cal.Rptr. 587, 3 A.L.R.4th 1185] [reversed multiple convictions for single course of conduct as pimp]; (*People* v. *White* (1979) 89 Cal.App.3d 143 [152 Cal.Rptr. 312] [no denial of due process for witness to testify to several acts of prostitution because panderer can only be convicted of one crime].)

We conclude it was not error to refuse a unanimity instruction in this prosecution for pimping and pandering.[6]

DISPOSITION

The judgment of conviction is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied August 9, 1991, and appellant's petition for review by the Supreme Court was denied October 16, 1991.

---

[6]As appellant correctly points out, the use note to CALJIC No. 10.71 defining pandering suggests a unanimity instruction in every case "[i]n view of the fact that the statute proscribes so many different acts in the alternative." (Use note to CALJIC No. 10.71 (5th ed. 1988 bound vol.), p. 625.)

We note most of the alternative language of CALJIC No. 10.70, defining pimping, and No. 10.71, defining pandering, was excised by the court. The remaining alternatives in the pandering instructions—"to become or continue to be a prostitute" and "giving or receiving money or thing of value for the purpose of prostitution," could not have created disagreement among the jurors.

Appellant's sole defense was she was unaware the escorts were prostitutes. The jury's only option was to accept or reject appellant's defense in its entirety. Under these circumstances, a unanimity instruction was unnecessary. (*People* v. *Ramirez, supra,* 189 Cal.App.3d at p. 613.)